Jerome Cohen and Rita Cohen v. Commissioner.
Cohen v. Commissioner
Docket No. 76532.
United States Tax Court
T.C. Memo 1963-31; 1963 Tax Ct. Memo LEXIS 314; 22 T.C.M. (CCH) 121; T.C.M. (RIA) 63031; February 4, 1963
*314 Sidney A. Soltz, Esq., for the petitioners. Louis J. DeReuil, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax,
I.R.C. 1939
Year
Deficiency
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
1953
$ 4,557.52
$181.04
$120.69
1954
6,011.68
556.07
360.70
1955
17,662.98
The principal issue is whether the petitioners are entitled to a business bad debt deduction in the amount of $100,862.87 for the taxable year 1955. If such deduction is allowabile, it affects petitioners' tax liability not only for 1955, but also for 1953 and 1954 by reason of carrybacks. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Petitioners, husband and wife, reside in Miami Beach, Florida. They filed their joint returns for the years in question with the director of internal revenue for the district of Florida. Jerome Cohen will sometimes hereinafter be referred to as petitioner. Petitioner graduated from law school in 1951, but he has not practiced law. His father, Will *315 Cohen, controlled Pierce Contractors, Inc. (hereinafter sometimes referred to as Pierce), a corporation engaged in the construction business. Petitioner's father and mother owned all of the stock of Pierce, except for qualifying shares. During 1953 and 1954 petitioner was employed by Pierce, and substantially more than one-half of the adjusted gross income reported by him for those years was attributable to his $15,000 annual salary from Pierce. From December 1951 through 1957 petitioner was also engaged in business as a general contractor under the name of "Jerome Construction Company (not inc.)". His total receipts, cost of goods sold, and gross profit for the years 1954 and 1955, reported in his joint returns for those years, were as follows: 1954
1955
Total receipts
$350,602.71
$317,975.98
Cost of goods sold
322,193.19
247,613.36
Gross profit
$ 28,409.52
$ 70,362.62
The business location of both Pierce and petitioner was at 279 N.E. 26th Street, Miami, Florida, where both occupied the same suite of offices. In 1954, Jefferson Construction Company, of Cambridge, Massachusetts (hereinafter sometimes referred to as Jefferson) entered into a prime *316 contract with the Corps of Engineers, United States Army, to perform certain construction work for the United States at the Homestead Air Force Base at Homestead, Florida. Early in January, 1955, Pierce entered into negotiations with, and submitted bids to, Jefferson to supply concrete and perform certain masonry and other work with respect to that project as subcontractor. A tentative agreement was reached between Pierce and Jefferson, but Pierce, which was then in some financial difficulties, was unable to furnish bonds of sufficient size in connection with its bid. Accordingly, Jefferson and Pierce determined to handle the matter as follows: To the extent that the prospective subcontract contemplated furnishing concrete (apart from any labor or services connected therewith), three separate subcontracts were drawn between Jefferson and petitioner in the name of his sole proprietorship whereby petitioner agreed to supply the concrete, and Pierce executed four other subcontracts with Jefferson for the remainder of its participation in the project. In that manner Pierce's obligations with respect to its contemplated work for Jefferson were formally reduced to a point whereby it was *317 able to furnish the required bonds relating to the subcontracts in its name, and separate bonds were obtained in petitioner's name in respect of the subcontracts in which he appeared as the subcontractor. Jefferson advanced the funds to pay for both sets of bonds. Petitioner did not negotiate his subcontracts with Jefferson; he merely executed the necessary papers supplied to him by his father, who had conducted the negotiations on behalf of Pierce. The foregoing subcontracts of both petitioner and Pierce with Jefferson were executed in January 1955. Jefferson treated these various subcontracts as a single, unified arrangement, and it looked to Pierce for performance thereunder regardless of whether a particular subcontract were formally made with Pierce or with petitioner. [1]
Petitioner was not in the concrete business, and had none to sell. The concrete supplied in fulfillment of petitioner's *318 subcontracts was obtained from Maule Industries, Inc. (hereinafter sometimes referred to as Maule), an entirely separate and independent organization which actually delivered the concrete at the project site. Neither petitioner nor any employee of petitioner participated in such deliveries, and, in most instances, the scheduling of the deliveries was arranged by a foreman of Pierce at the project site. As deliveries of concrete were thus made from time to time at the project site, petitioner became entitled to receive partial payments, or advances, or "draws", from Jefferson under the subcontracts to which he was formally a party. Such draws were to be made for work done in the preceding month based upon an estimate of the percentage of work performed in that month; however, 10 percent of the total was to be retained by Jefferson until final acceptance. By June 10, 1955, petitioner had received a net aggregate of $70,088 from Jefferson as draws under one subcontract, and by July 15, 1955, he had received a net aggregate of $20,700 from Jefferson as draws under another subcontract. Each of petitioner's three subcontracts providing for such draws or advances contained a specific undertaking *319 by petitioner that - * * * he will receive any funds paid or advanced under said contract as a trust fund, to be applied first to the payment of the amounts owing to any person who has * * * furnished * * * materials for the Subcontractor upon the work under the said contract before using any of the same for any other purpose. (Article 3.) Article 5 of each of these subcontracts provided that the subcontract might be terminated by Jefferson by giving five days written notice if the subcontractor "should fail to make prompt payment to his * * * suppliers". Similar provisions were contained in Pierce's subcontracts. Neither petitioner nor Pierce complied with the foregoing provisions. In connection with supplying the concrete required by petitioner's subcontracts Maule had furnished concrete for which it had billed petitioner an aggregate amount of $78,087.44. However, petitioner had made payments of only $25,331.38 to Maule, leaving an unpaid balance of $52,756.06, and he has never made any further payments up to the date of the trial herein. Instead of using his draws from Jefferson to discharge the liability to Maule or to keep them as a trust fund for that purpose as required *320 by his subcontracts, he in fact violated those subcontracts and paid over such draws directly to Pierce or used them for Pierce's benefit by paying some of Pierce's bills. By July 15, 1955, petitioner's draws had reached a net aggregate of not less than $90,788. Between July 1 and July 15, 1955, Jefferson had learned from Maule's credit department of the deficiencies in payments by petitioner to Maule for the concrete purchased, and it refused any further draws to petitioner after July 15, 1955. On September 21, 1955, Jefferson wrote three letters notifying petitioner of the cancellation of each of the three subcontracts entered into in January 1955 with petitioner. In each of these letters the following reason was given for the cancellation: Said cancellation is occasioned by your failure to fulfill the obligations of your contract in that you have failed to make payment to material suppliers and others as required by the contract and have in other respects violated the terms of this contract. On September 21, 1955, Jefferson also wrote eight letters to Pierce notifying it of the cancellation of its eight subcontracts. The same reason for cancellation was given in each of *321 them as was given in the three notices to petitioner. On October 17, 1955, Maule sent the following demand to petitioner by registered mail: We enclose statement showing a balance due us of $52,756.06. As this is now considerably past due, we must insist that payment in full be made without further delay. Petitioner made no payment in response thereo. In 1956 Jefferson paid Maule $40,556.06 on the $52,756.06 balance owed to Maule for the concrete which it had furnished in respect of petitioner's subcontracts with Jefferson. Maule thereupon instituted suit against petitioner for the remaining unpaid balance of $12,000. It obtained judgment against him in the amount of about $15,000, including interest, which he has never paid. During 1952 and 1953, Pierce had performed construction work in Charleston, South Carolina, under a subcontract with Conn Structors, Miami, Florida, which held a prime construction contract with the United States at the Charleston Air Force Base, Charleston, South Carolina. It concluded its work on the Charleston job in late 1953 or early 1954. In 1954 it had also performed some work for a Memphis, Tennessee, contractor on a Homestead Air Force Base *322 job. It was unable to collect certain amounts claimed to be due it from these two jobs, and the nonpayment of these amounts left it in 1954 and 1955 in "bad shape" financially and short of operating funds and working capital needed to carry on its construction business. In 1954 and 1955 it had a rather poor credit rating in the Miami area and was unable to borrow from financial institutions in that area. During 1954 and 1955 petitioner made advances to Pierce for use in payment of its operating expenses. In petitioner's books there was an open account in which a record was kept of all funds advanced directly to Pierce or spent for its benefit, and repayments made by Pierce. During 1954, debits reflected in that account, labeled "Pierce Contractors, Inc., Exchange Account," representing advances by petitioner to Pierce, or payments to suppliers of Pierce for Pierce's benefit, totalled $57,631.85, and credits to this account, representing repayments by Pierce, totalled $34,271.50. On December 31, 1954, the account had a net debit balance of $23,360.35, representing net advances by petitioner to Pierce during 1954. Also, during 1954, there were total debits in a special account *323 labeled "Pierce Contractors, Inc., Exchange Account (Due from Pierce-Homestead Job)," reflecting payments by petitioner to material suppliers of Pierce on the 1954 Homestead job, [2] amounting to $5,528.33. No repayments by Pierce are shown on this latter account. The foregoing net debit balances of $23,360.35 and $5,528.33 for 1954 were carried over to the Pierce "Exchange Account" for 1955. During 1955 petitioner continued to make advances to Pierce for working capital in its operations. Such advances were recorded as debits in the "Exchange Account." And when petitioner paid over to Pierce (or expended on Pierce's behalf) the draws which he had received from Jefferson, such payments or expenditures were likewise recorded on the "Exchange Account" as debits. Prior to the first such payment or expenditure, which occurred on March 1, 1955, petitioner had already made payments to or on behalf of Pierce in 1955 in the aggregate amount of approximately $16,000 to assist Pierce in financing work *324 done by it. During 1955, all the debits recorded in the foregoing Pierce "Exchange Account," including payments and expenditures out of the draws from Jefferson, totalled $165,826.24. All the credits in that account for 1955 were in the aggregate amount of $93,852.05. Thus, on December 31, 1955, the account had a net debit balance of $100,862.87 computed as follows: Balance, Jan. 1, 1955
$ 23,360.35
Balance, Jan. 1, 1955 ("Homestead
Job")
5,528.33
Total debits, 1955
165,826.24
$194,714.92
Less total credits, 1955
93,852.05
$100,862.87 It is this debit balance of $100,862.87 which petitioner claimed as a business bad debt for 1955. Petitioner and his father, acting in behalf of Pierce, signed an "agreement" dated April 6, 1955, wherein Pierce purported to assign to petitioner the retained percentages which Jefferson had withheld from Pierce's draws or which it would withhold from Pierce's future draws, until the return to petitioner of all amounts advanced by petitioner on Pierce's subcontracts. On July 23, 1955, Pierce wrote to Jefferson notifying it of the foregoing "assignment." Jefferson replied by letter of August 2, 1955, that it could not accept *325 the assignment; that the retained funds must be used to pay creditors; and that the assignment would not be in accord with Jefferson's obligations to Pierce's contract surety. A substantial claim of Pierce against the United States, arising out the Charleston Air Force job, has been in litigation eight or nine years and presently is in litigation. On May 8, 1956, Pierce filed a Statement of Financial Condition on Treasury Department Form 433-B, prepared and sworn to under oath by Will Cohen, President of Pierce, in which its sole asset as of that date was listed as "Accounts receivable $241,000" and its sole liability as "Accounts payable $136,232." A report of the District Director of Internal Revenue, Jacksonville, Florida, dated March 1, 1957, contains the statement that Pierce "has no assets, except accounts receivable which are in litigation at the present time." On April 24, 1961, Ellard G. Conn and Victor Conn, d/b/a Conn Structors, and the Cheshire National Bank of Keene, New Hampshire, complainants, filed suit in the United States Court of Claims against the United States of America, defendant, in which certain claims are made by Conn Structors in its own behalf and *326 in behalf of some of its subcontractors, including Pierce, for unpaid work performed on the Charleston Air Force Base project, Charleston, South Carolina, in 1952 and 1953, which suit still is in litigation. In their return for the year 1955, petitioners deducted the amount of $100,862.87, the debit balance shown in the "Pierce Contractors, Inc., Exchange Account" at the end of that year, as a business bad debt which resulted in a net operating loss of $53,643.85. This net operating loss was carried back to the years 1953 and 1954 in the amounts of $18,835.56 and $25,326.10, respectively. Respondent disallowed the claimed deduction as a business bad debt in 1955, and determined that petitioners were not entitled to any net operating loss carry-back to the years 1953 and 1954. Petitioners failed to make and file a declaration of estimated tax for the taxable years ended December 31, 1953 and December 31, 1954. Opinion RAUM, Judge: Petitioner claims that the debit balance in the Pierce exchange account at the end of 1955, in the amount of $100,862.87, represents business loans made by him to Pierce, and that the resultant composite debt became worthless in 1955. He does not *327 contend that he was in the business of lending money; nor does he make any contention to the effect that the alleged debt was a "business" debt by reason of his being an officer of Pierce. But he does take the position that the net "advances" of $100,862.87 which he made to Pierce arose out of his three January 1955 subcontracts with Jefferson; that Jefferson treated these three subcontracts and the four January subcontracts of Pierce merely as parts of a single contractual arrangement; that Pierce's financial difficulties imperiled its ability to perform; that Jefferson had threatened to default both Pierce and petitioner if Pierce's performance of its January 1955 contracts was not satisfactory; that he made the advances in question to Pierce to enable it to perform its subcontracts, thus keeping his own subcontracts in good standing and thereby protecting the profit that he expected to realize from his own subcontracts. We think that there are certain fatal defects in the assumptions underlying this line of argument, and that the claimed deduction must be disallowed for at least several reasons. 1. At the outset we do not accept petitioner's starting point that all of the net *328 debit balance of $100,862.87 represents a bona fide debt from Pierce to petitioner. To the contrary, to the extent that the $100,862.87 figure compreliends petitioner's payment of his Jefferson draws to Pierce or his expenditure of such draws in Pierce's behalf, it is our view, on the record before us, that no bona fide debt arose between Pierce and petitioner. It is all too clear to us that petitioner's three subcontracts and Pierce's related four subcontracts were but parts of a single project negotiated by Pierce in its own behalf; that exigencies relating to the furnishing of bonds were alone responsible for designating petitioner as the formal party in three of the subcontracts; that petitioner did not participate in any way either in the negotiation of or the rendition of services under his subcontracts; that his signature as a formal party was merely an accommodation to his father to enable his father's corporation to obtain the single job from Jefferson that was reflected in the seven subcontracts taken together; and that when he received the draws from Jefferson and paid them over to his father's corporation or expended them in its behalf he was acting as a conduit for it. *329 His three subcontracts were merely a subterfuge to enable Pierce to carry out its arrangements with Jefferson, and the moneys obtained by him from Jefferson which he made available to Pierce were simply funneled through him. The evidence shows that the project was divided into seven subcontracts merely to facilitate the issuance of bonds, and that such division was arbitrary, without any effort to arrange for any equalization of anticipated profit as between the various individual subcontracts. It would strain our credulity to the breaking point to conclude that petitioner ever contemplated retaining for himself (as against his father's corporation) the large anticipated profits from his three subcontracts about which he testified, when it is recalled that it was only the corporation that was concerned with the project; that he performed no services in connection with it; that the corporation was in financial difficulties; that he had been engaged in a course of conduct to assist it in extricating itself from such difficulties; and that the comparatively large profits potentially allocable to his three subcontracts were simply the fortuitous result of the arbitrary division of the *330 project among seven subcontracts in all. Rather, it is clear to us that petitioner was concerned about his father's corporate business, and became a formal party to three of the subcontracts to enable his father to carry out the entire project as originally negotiated with Jefferson. It is incredible to us in the circumstances of this case that it was ever the intention of the parties that petitioner would keep as against his father's corporation, the possibly substantial profits that might result from the artificial fragmentation of the entire project into seven parts. To the contrary, the conclusion is far more convincing that petitioner was merely a formal party to the three subcontracts as an accommodiation to his father, and that his disbursement of the Jefferson draws for the benefit of his father's corporation simply carried out that understanding and did not result in the creation of any debt from the corporation to petitioner. We think it unnecessary to discuss further the foregoing and other evidence of record which leads us to this conclusion. The testimony was often confusing or couched in euphemistic terms. Suffice it to say we are satisfied on the entire record that *331 the disbursement of petitioner's draws to or in behalf of Pierce was merely rendering unto Pierce that which was really Pierce's, and that he made no bona fide loans to Pierce to that extent. Accordingly, no basis exists for any bad debt deduction in relation to such payments or expenditures in Pierce's behalf. [3]
To be sure, the respondent has not argued that "advances" to or on behalf of Pierce out of the draws did not result in bona fide debts. But the procedural rule has long been established that the respondent's determination may be sustained on grounds other than those urged by him and that if the determination is correct it will be upheld even if he has relied upon the wrong reason to support it. (C.A. 8); *332 (C.A. 5); (C.A. 8); (C.A. 4); (C.A. 6); (C.A. 5); (C.A. 10); cf. . Moreover, even if we were to assume that a bona fide debt was created, we must reject petitioner's contention that he made advances of such draws to Pierce in order to protect his anticipated profit from his own subcontracts. The fact is that the making of such advances, rather than paying Maule's bills, constituted a breach of the subcontracts and jeopardized the very profit which petitioner now says he wanted to protect. We do not find the explanation credible in any event. 2. It is true that a portion of the alleged bad debt of $100,862.87 does not have its source in petitioner's draws from Jefferson, and that such portion does reflect advances by petitioner to Pierce that were bona fide loans. But the difficulty with petitioner's position *333 is that we cannot find that the resultant debt was a "business" debt. Petitioner's argument as outlined in the first part of this opinion, is that all of his advances to Pierce were made for the purpose of protecting his anticipated profits under his three subcontracts with Jefferson and therefore represented "business" loans. There are at least two complete answers to this contention. (a) In the first place, as pointed out in 1, supra, we have found that petitioner's participation in the three subcontracts was merely as an accommodation to his father, that he was but a conduit to his father's corporation with respect to funds received by him from Jefferson, and that there was never any intention that he would retain the comparatively large anticipated profits that might fortuitously be ascribed to him as a result of the artificial fragmentation of the project into seven subcontracts. Accordingly, we cannot conclude that the so-called bona fide loans were made by petitioner for the purpose now advanced by him. (b) Secondly, the record facts belie the assertion that all of these loans were made for that purpose, even if it be assumed that petitioner actually contemplated the realization *334 for his own benefit of the alleged profits to be derived from his three subcontracts. Certainly, his advances to Pierce in 1954, resulting in net debit balances in his favor as of January 1, 1955, in the amounts of $23,360.35 and $5,528.33 had nothing whatever to do with his three subcontracts (subsequently entered into) and any possible profits available to him therefrom. Moreover, the record affirmatively shows that the petitioner's first advance to Pierce in 1955 that had any connection with his three subcontracts was made on March 1, 1955, in the amount of $27.81. But petitioner had already made advances totalling about $16,000 to Pierce between January 1 and March 1, 1955. Plainly, these advances were wholly unrelated to his three subcontracts. And although his various advances thereafter are listed in the record, it is not possible to determine from the evidence to what extent they were related to the three subcontracts and the project which gave rise to those subcontracts. We think that petitioner's explanation that he made the various advances in order to protect his anticipated profits is spurious and we so find. Rather, our view of the evidence persuades us that petitioner *335 was making a sustained effort to save his father's fairering corporation from financial disaster. His purpose was a personal one; it was not related to his business. Accordingly, we cannot find that the debt in issue, to the extent that it was bona fide, was a "business" debt. This conclusion calls for approval of the Commissioner's determination. 3. Finally, the Commissioner's disallowance of deduction for the alleged business bad debt must be sustained upon the further ground that it did not become worthless in 1955. Although the Commissioner did not take this position in his determination of deficiency, he so argues in this Court as an alternative ground. He is entitled to do so, and we think the record supports his position. Petitioner, in an effort to establish worthlessness in 1955, relies in part upon a penalty assessment proposed against him and his father on March 1, 1957, by the District Director of Internal Revenue for their failure as officers of Pierce to pay over to the Government certain Federal income and social security taxes of Pierce's employees withheld from the wages of such employees in 1953. The proposed assessment states: The taxpayer corporation has no *336 assets, except accounts receivable which are in litigation at the present time. On Sept. 23, 1955 assets of the taxpayer were seized by the Internal Revenue and the sum of $12,737.00 was realized and credited to taxpayer's unpaid accounts. It also states: Prospects for collecting penalty assessments from the above-named persons appears to be good as they are both still in the construction business. Although the foregoing exhibit furnishes some support for petitioner's position, it more cogently reflects, in the context of this record, a callous disregard for the rights of creditors including the United States Government. The record further shows that on May 8, 1956, petitioner's father filed a sworn statement of financial condition on behalf of Pierce in which he listed as an asset "Accounts receivable $241,000," and as its sole liability "Accounts payable $136,232." The accounts receivable represented certain claims in litigation which had not yet been resolved at the date of the hearing in this case. Taking these facts into account, together with the evidence that petitioner's father was still in the construction business in 1957, we find that to the extent that the $100,862.87 *337 item represented a bona fide debt from Pierce to petitioner such debt did not become worthless in 1955. The Commissioner has conceded the Section 294(d)(2) additions to tax, and since petitioners have either conceded other adjustments or have not presented any evidence with respect to them, apart from the foregoing business bad debt issue, Decision will be entered for the respondent except for the Section 294(d)(2) additions to tax. Footnotes
1. Pierce also entered into four other subcontracts with Jefferson in April and May 1955 for additional work at the Homestead base; however, these were entirely distinct from the January subcontracts and petitioner's subcontracts had no connection with these later subcontracts of Pierce.↩
2. Work on this job was performed for the Memphis, Tennessee, contractor referred to above and bears no relation to the work performed by Pierce for Jefferson under the 1955 subcontracts.↩
3. The precise net amount of draws thus made available to Pierce does not clearly appear in the record. Presumably it was not less than the $90,788 of draws set forth in our findings minus the $25,331.38 which petitioner paid to Maule for concrete. We are not satisfied that any of the "credits" in the exchange account represented repayment of such draws.↩